930 So.2d 1214 (2006)
THH PROPERTIES LIMITED PARTNERSHIP, D & B Thompson Investments, L.P., Thompson Huffman Limited Partnership and Melrose Properties, L.L.C., Plaintiffs-Appellees,
v.
Al G. HILL, III, Defendant-Appellant.
No. 41,038-CA.
Court of Appeal of Louisiana, Second Circuit.
June 2, 2006.
*1216 Blanchard, Walker, O'Quin & Roberts by Paul M. Adkins, Robert W. Johnson, Scott R. Wolf, Gardere, Wynne, Sewell, LLP by Craig B. Florence, Steven C. Lockart, for Appellant.
Cook, Yancey, King & Galloway by Curtis R. Shelton, J. Benjamin Warren Jr., for Appellees.
Before GASKINS, MOORE and LOLLEY, JJ.
GASKINS, J.
The defendant, Al G. Hill, III, appeals from the granting of a motion for partial summary judgment in favor of the plaintiffs on a $2 million continuing guaranty signed by Hill. We reverse and remand.

FACTS
In 1998, the plaintiffs entered into negotiations to sell 17 gas stations/convenience stores to Easterhill, Ltd. Eight of the stores were in Texas, seven in Louisiana and two in Arkansas. Easterhill, Ltd., was owned approximately 99 percent by Hill, the defendant in the instant suit, and was managed through a general partnership owned by Hill. Easterhill arranged partial financing through Enterprise Mortgage Acceptance Company ("EMAC") while the sellers were to take promissory notes from Easterhill for the balance of the purchase price. When the plaintiffs were told that they would be required to subordinate their financing to EMAC's loan, they threatened to kill the deal. In November 1998, Hill met with Joe Thompson, a representative of the plaintiffs, and negotiated a deal whereby Hill agreed to provide a $1 million personal guaranty of Easterhill's two notes to the plaintiffs and the plaintiffs agreed to subordinate the notes to EMAC's loan.
On December 16, 1998, two agreements pertaining to the sales were signed. The contracts, which were drafted by the plaintiffs' attorney, provided that Texas law applied. The plaintiffs were to provide seller financing in the amounts of $3,223,127.40 and $526,872.45, as evidenced by notes from Easterhill to the plaintiffs. These notes were subordinated to the EMAC loan which funded the rest of the purchase price.
The agreements provided for a continuing guaranty by Hill to guarantee payment of the notes in an aggregate not to exceed $1 million. However, in the closing documents, the continuing guaranty was raised to $2 million. Hill also signed a guaranty *1217 agreement in which he guaranteed performance of the security agreements.
Easterhill filed for bankruptcy in January 2002. In October 2002, the plaintiffs filed suit against Hill in Louisiana state court, seeking the accelerated balance of the notes, attorney fees, and court costs. Hill was successful in getting the case removed to federal court as being related to Easterhill's bankruptcy. However, it was later remanded to state court, and Hill filed an answer in January 2005.
All but one of the plaintiffs filed a motion for partial summary judgment in March 2005.[1] In April 2005, the trial court granted the motion, awarding the movants $2 million with interest at the rate of eight percent per annum from December 19, 2001 until paid, plus attorney fees and expenses through March 4, 2005 of $49,896.54. The judgment also reserved the rights of the plaintiffs as to the balances owed on the notes and the defendant's obligations pursuant to the security agreements and guarantees which were the subject of the lawsuits. Hill filed a motion for new trial, which the trial court denied in August 2005.
Hill appeals.

AFFIDAVITS
The movants submitted the affidavit of Joe D. Thompson in support of their motion for partial summary judgment. He stated that he had custody of the relevant records about the transaction at issue; copies were attached to the affidavit. He asserted that the notes involved were past due and owing for payments due beginning on January 19, 2002, and that the balances on the two notes were $2,277,541.44 and $372,237.65 with interest accruing at a rate of eight percent per annum from December 19, 2001 until paid in full. Thompson further stated that each note provided that it shall immediately come due and payable without notice or putting in default under certain circumstances. Each note provided that it shall become due and payable subject to written notice to maker. According to Thompson, Easterhill and Hill had been provided notice of default by a letter mailed on August 19, 2002, and received by Hill.
As to the attorney fees, the movants filed the affidavit of Curtis R. Shelton, one of their attorneys. He stated that he had custody of the relevant records at the law firm of Cook, Yancey, King & Galloway concerning the instant case. The hourly rate charged by the attorneys who worked on this case ranged from $150 to $200 per hour for attorneys and $60 to $75 for paralegals. As of the date of the March 4, 2005, affidavit, Shelton stated that the fees amounted to $47,020.54 and the expenses to $2,876, for a total of $49,896.54.
In opposition to the motion, affidavits were submitted by the defendant; Michael E. Nugent, the in-house counsel for Easterhill; and Brent N. Waller, the vice president of Hill III Investments, LLC, the general partner of Food Fast Holdings, Ltd. and Easterhill.
In his affidavit, the defendant stated that he was the president and holder of majority membership interest in Hill III Investments, LLC, the sole general partner of Easterhill, Ltd. In 1998, he negotiated with Thompson for the potential acquisition of 17 convenience stores owned by the plaintiffs. As negotiations progressed, the plaintiffs threatened to terminate *1218 the deal because EMAC, Easterhill's lender, required the plaintiffs to subordinate their notes to EMAC's loan. In a November 1998 meeting with Thompson in Tyler, Texas, the defendant stated that he agreed to provide a limited personal guaranty not to exceed $1 million to resolve the dispute.
At the closing on January 19, 1999, he was presented with a "room full of documents" drafted by the plaintiffs' transactional attorney relating to Easterhill's purchase of 17 stores in three states. The defendant stated in his affidavit that it was never his understanding or intention to increase his personal liability to $2 million. He was not provided with consideration of any kind to modify his guaranty or increase his liability thereunder. He stated that it was his understanding that his personal guaranty would never exceed $1 million, subject to the additional restrictions in the continuing guaranty.
Nugent stated in his affidavit that, as Easterhill's in-house counsel, he was involved in negotiations with the plaintiffs. This was not the first purchase of convenience stores by Easterhill. In prior transactions, Easterhill had obtained financing from EMAC, which always required the seller to subordinate its financing to EMAC's loan. Nugent stated that he informed the plaintiffs of this condition before the drafting or execution of any documents. In his experience, it was not unusual for sellers to subordinate their notes to that of the primary lender in a commercial transaction of this nature.
Waller likewise stated in his affidavit that he was involved in Easterhill's negotiations to purchase 17 convenience stores owned by the plaintiffs. He also stated that in prior purchases of convenience stores, Easterhill got financing from EMAC, which always required the seller to subordinate its financing to EMAC's loan. Waller stated that he informed the plaintiffs of this condition before the drafting or execution of any documents and encouraged Thompson to speak to the owners of the store the purchaser had bought months earlier. According to Waller, the plaintiffs threatened to terminate the deal because of the requirement, and, even after the parties executed agreements of purchase and sale on December 16, 1998, the plaintiffs again expressed their unwillingness to the subordination. Waller stated that between December 16, 1998 and the January 1999 closing, Easterhill devoted significant time and accounting and legal resources to insure legally proper transition of the stores, as well as addressing employee and licensing matters.

CHOICE OF LAW
Under Louisiana law, it is acceptable for contracting parties to make a choice of state law which will govern the agreement between them. That choice will be given effect, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under La. C.C. art. 3537. La. C.C. art. 3540; Sentilles Optical Services, Division of Senasco, Inc. v. Phillips, 26,-594 (La.App.2d Cir.3/1/95), 651 So.2d 395.
In their contracts, the parties in the instant case agreed that Texas law would apply. Therefore, we apply Texas substantive law in resolving the issues before us. However, we find that use of Louisiana procedural law on summary judgment is appropriate.

SUMMARY JUDGMENT LAW
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 *1219 So.2d 342 (La.1991). A court must grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(B). Summary judgment procedure is favored and is designed to secure the just, speedy and inexpensive determination of actions. La. C.C.P. art. 966(A)(2).
The party opposing summary judgment cannot rest on the mere allegations or denials in his pleadings, but must show that he has evidence which, if believed, could satisfy his evidentiary burden of proof at trial. If he has no such evidence, then there is no genuine issue of material fact, and the movant is entitled to summary judgment. La. C.C.P. art. 966(C)(2); Mosley v. Temple Baptist Church Of Ruston, Louisiana, Inc., 40,546 (La.App.2d Cir.1/25/06), 920 So.2d 355.
Because the applicable substantive law determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. Lemann v. Essen Lane Daiquiris, Inc., XXXX-XXXX (La.3/10/06), 923 So.2d 627.

AFFIDAVIT BASED UPON PERSONAL KNOWLEDGE
Hill argues that Thompson's affidavit fails to prove notice of default or the outstanding balances on the notes because the affidavit was not made on Thompson's personal knowledge.
Regarding the use of affidavits, the requirement of La. C.C.P. art. 967 that "affidavits shall be made on personal knowledge" has been strictly enforced; it is insufficient for an affiant to merely declare that he has "personal knowledge" of a certain fact. The affidavit must affirmatively establish that the affiant is competent to testify to the matters stated by a factual averment showing how he came by such knowledge. Express Publishing Company, Inc. v. Giani Investment Company, Inc., 449 So.2d 145 (La.App. 4th Cir.1984).
Personal knowledge means something which a witness actually saw or heard, as distinguished from something a witness learned from some other person or source. Panameno v. Louisiana Riverboat Gaming Partnership, 36,172 (La. App.2d Cir.10/23/02), 830 So.2d 489; Shelter Insurance Company v. Broan-Nutone, LLC, 39,625 (La.App.2d Cir. 5/11/05), 902 So.2d 1146, writ denied, XXXX-XXXX (La.12/16/05), 917 So.2d 1112. The court must first determine whether the supporting affidavits and documents presented by the moving party are sufficient to resolve all material issues of fact. If they are not sufficient, summary judgment is not appropriate. South Central Bell Telephone Company v. Rouse Company of Louisiana, 590 So.2d 801 (La.App. 4th Cir.1991).

Balance
Hill argues that Thompson's affidavit was insufficient to establish the balance of the notes because it failed to establish that he had any basis for personal knowledge of the payment history of the notes. He states that he was custodian of the records without reciting that he had any personal knowledge or that he had reviewed records of the outstanding principal balance due on the notes. Nor are there attachments to his affidavit of copies of balance sheets, ledgers, cancelled checks or other documents which would tend to establish the balance.
Thompson's affidavit established that he was a custodian of the relevant business records, and supporting documentation was attached to the affidavit. Thompson set forth the balances due on the notes. *1220 The defendant has not contested the amounts provided by the movants.
We agree with the trial court that the affidavit was sufficient to prove the balance due on the notes.

Notice
The notice provision in the Agreements for Purchase and Sale set forth addresses for notices "required hereunder," which indicated only notices required by that document. The notes executed by Easterhill required notice to the maker, while the security agreements stipulated an address for the debtors' notice. The only prerequisite for the personal guarantees of Hill to be exigible was for the notes to be accelerated, which was accomplished by giving notice to Easterhill pursuant to the language found in the notes.[2] Since no address was specified in the notes, then the notice had to be reasonable. The movants presented proof that the notice had been sent to the offices of Easterhill's and Hill's attorneys; one of the law firms was located in the same building as Easterhill, but in a different suite. Hill presented no evidence that he did not receive the notice or that the notice was unreasonable. The trial judge did not commit error in finding the notice to be properly given.

GUARANTY AGREEMENT
A guaranty agreement creates a secondary obligation whereby the guarantor promises to be responsible for the debt of another and may be called upon to perform if the primary obligor fails to perform. Tenneco Oil Company v. Gulsby Engineering, Inc., 846 S.W.2d 599 (Tex. App.-Houston [14th Dist.] 1993, writ denied). A guaranty agreement is to be strictly construed and shall not be extended beyond its precise terms by construction or implication. Tenneco Oil Company, supra.
A guarantor's obligation should not be extended by implication beyond the written terms of the agreement, and any ambiguity should be construed in favor of the guarantor. Thompson v. Preston State Bank, 575 S.W.2d 312 (Tex.Civ.App.Dallas 1978, writ ref'd n.r.e.).
It is well settled in Texas that a guarantor may rely and insist upon the terms and conditions of his guarantyship being strictly followed, and if the creditor and principal debtor vary in any material degree the terms of their contract, then a new contract has been formed, upon which the guarantor is not obligated or bound. McKnight v. Virginia Mirror Company, 463 S.W.2d 428 (Tex.1971). After the terms of a guaranty agreement have been ascertained, the rule of strictissimi juris applies, meaning that the guarantor is entitled to have his agreement strictly construed and that it may not be extended by construction or implication beyond the precise terms of his contract. McKnight, supra; Reece v. First State Bank of Denton, 566 S.W.2d 296 (Tex.1978).
As a general rule, a party who signs a contract is presumed to know its contents; absent a finding of fraud, its failure to read the contract will not discharge its obligations. Parties to a contract have an obligation to protect themselves by reading what they sign. A party who signs a contract is charged with notice of its contents as a matter of law. D. Wilson Construction Company, Inc. v. McAllen Independent School Distrist, 848 S.W.2d 226 (Tex.App.-Corpus Christi 1992, writ dism'd w.o.j.).
*1221 Absent proof of mental incapacity, a person who signs a contract is presumed to have read and understood the contract, unless he was prevented from doing so by trick or artifice. Tamez v. Southwestern Motor Transport, Inc., 155 S.W.3d 564 (Tex.App.San Antonio 2004, no pet.).
While a party's failure to read an instrument before signing is not always a bar to that party's suit for reformation to correct a mutual mistake, the general rule is that in the absence of a showing of fraud or imposition, a party's failure to read an instrument before signing it is not a ground for avoiding it. Estes v. Republic National Bank of Dallas, 462 S.W.2d 273 (Tex.1970).
Most of the cases and legal writers affirm the proposition that equitable relief will be granted against a unilateral mistake when the conditions of remediable mistake are present. These conditions generally are: (1) the mistake is of so great a consequence that to enforce the contract as made would be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the mistake must have been made regardless of the exercise of ordinary care; and (4) the parties can be placed in status quo in the equity sense, i.e., rescission must not result in prejudice to the other party except for the loss of his bargain. There may be other circumstances which will govern or influence the extension of relief, such as the acts and extent of knowledge of the parties. James T. Taylor and Son, Inc. v. Arlington Independent School District, 160 Tex. 617, 335 S.W.2d 371 (1960).
Hill's affidavit states that at the time of the initial agreement in December 1998, he agreed only to a continuing guaranty of $1 million, as reflected by the draft for the guaranty. At closing, the personal guaranty signed by Hill was for the sum of $2 million. In his affidavit, Hill declared that it was never his understanding or intent to increase his personal liability to $2 million. He also stated that he was not provided with consideration of any kind to modify his guaranty or to increase his liability under the guaranty.
As to the issue of the intended amount of the continuing guaranty, we find that Hill's affidavit raises a genuine issue of material fact sufficient to defeat summary judgment. Accordingly, we reverse the trial court's granting of partial summary judgment. We remand the case to the trial court for further proceedings.[3]

ATTORNEY FEES
As a general rule, attorney fees may not be awarded to a successful litigant unless specifically provided for by statute or contract. Curtis v. Curtis, 28,698 (La.App.2d Cir.9/25/96), 680 So.2d 1327. The reasonableness of an attorney fee is within the great discretion of the trial court. Curtis, supra.
When the services of an attorney are evident from the record, proof of services is not necessary. Federal Services Corporation v. Mule-Durel, Inc., 95-2192 (La.App. 4th Cir.5/15/96), 676 So.2d 597, writ denied, 96-1562 (La.9/27/96), 679 So.2d 1346.
In his affidavit, Shelton states that the hourly rate charged by him and the attorneys in his firm who worked on this case ranged from $150 to $200 per hours, while the rate for paralegal work was $60 to $75. However, the affidavit fails to set forth the specific number of hours worked at the various rates. Instead *1222 Shelton recites a total of $47,020.54 in fees and $2,876 in expenses or a total of $49,896.54. Further, there is no supporting documentation, such as a billing statement, attached to the affidavit.
Accordingly, we find that the affidavit was insufficient to establish the amount of attorney fees to be awarded.

CONCLUSION
We reverse the trial court judgment granting partial summary judgment in favor of the movants. We remand the matter to the trial court for further proceedings.
Costs of this appeal are assessed against the movants/appellees.
REVERSED AND REMANDED.
NOTES
[1] The plaintiffs are THH Properties Limited Partnership, D & B Thompson Investments, L.P., Thompson-Huffman Limited Partnership and Melrose Properties, L.L.C. Of these, Melrose Properties was the only plaintiff which did not move for partial summary judgment against Hill. Consequently, we refer to the parties who filed the motion for partial summary judgment as the "movants."
[2] Since plaintiffs' rights were reserved on the security agreements signed by Easterhill and Hill, the fact that those documents contained specific addresses for notice is not pertinent at this time.
[3] Because we find that there is disputed issue of material fact as to the amount due on the continuing guaranty, we pretermit as unnecessary the issue of consideration raised in conjunction with this issue.